Bradley LEWIS, Plaintiff–Appellant,

v.

Kenneth S. APFEL, Commissioner of the Social Security Administration, Defendant–Appellee.

No. 99–55356.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted Oct. 13, 2000

Filed Jan. 2, 2001

Martin Taller, Anaheim, California, for the plaintiff-appellant.

Frank W. Hunger, Assistant Attorney General, Alejandro N. Mayorkas, United States Attorney, Janice L. Walli, Chief Counsel, Region IX, D.J. Edelman and Leo R. Montenegro, Assistant Regional Counsel, Social Security Administration, San Francisco, California.

Before: TASHIMA, TALLMAN, Circuit Judges, and ALSUP, District Judge.[1]

ALSUP, District Judge:

Bradley Lewis appeals the magistrate judge's affirmance of a final decision of the Commissioner of Social Security, which denied his application for disability insurance and supplemental security income benefits under Titles II and XVI of the Social Security Act. He alleges that he was disabled by several conditions: a seizure disorder, drowsiness from his medications, mild mental retardation, and an organic personality disorder that caused him to act inappropriately in work and social situations. An administrative law judge determined that he had the residual functional capacity to perform his past relevant work (as a part-time lot-and-lobby attendant) or, in the alternative, to perform various jobs identified by a vocational expert. The magistrate judge then dismissed Lewis's suit challenging the ALJ's determination. Because the ALJ's decision is not supported by substantial evidence, we reverse the judgment of the magistrate judge and remand with instructions to direct the Commissioner to calculate Lewis's benefits.

## Background Statement

Bradley Lewis suffers from a seizure disorder, with which he was diagnosed as a child. Two types of seizures afflict him: petit mal and grand mal. Petit mal seizures are less serious but more frequent. They last for seconds and do not cause him to lose consciousness. Grand mal seizures do; and, though less frequent, last for two to five minutes. Medications for his disorder, he alleges, make him groggy. Lewis is also mildly mentally retarded, with a verbal and full-scale IQ of 78 and a performance IQ of 81.

Lewis was hospitalized for grand mal seizures in April, September, and December 1990; May 1991; and November 1993. Lewis also reported or was treated for seizure episodes in November 1990, March 1991, August 1992, and July 1994. Many of these episodes, according to his treating physicians' notes, followed Lewis's failure to comply with his prescribed therapy. Lewis's family members testified that Lewis had nightly petit mal seizures. Lewis's brother testified that he had about 150 daytime petit mal seizures in 1993–94. His family members all testified that he suffered from severe fatigue. In the opinion of his treating psychologist, he had poor social perception, which caused him to act inappropriately and often led to problems in both work and social life.

Lewis has worked on and off—occasionally up to twenty hours per week, but never full time. In the mid to late–1980s, he worked as a laborer in his sister's construction company.[2] She testified that, despite his willingness, he could not complete his work (such as sweeping floors) without her assistance or supervision. Lewis worked as a box boy at a supermarket five days a week in 1989–90, and as a napkin/silverware wrapper at a Red Lobster restaurant three days a week in 1991–92.

Starting in June 1993, Lewis worked at a McDonald's as a lobby-and-lot attendant, cleaning tables, floors, and the parking lot. He worked eighteen to twenty hours a week for about two months before his hours were cut back. By June 1994, at the time of the hearing, he was working only two-and-a-half to five hours per day, one or two days a week, for a maximum of ten hours per week. Lewis testified that, although the McDonald's owner had told him

1. The Honorable William Alsup, United States District Judge for the Northern District of California, sitting by designation.

2. The evidence regarding when Lewis worked for his sister's construction company is con-

flicting. Lewis's sister testified at the June 1994 hearing that he had worked there from 1987–91. A vocational report submitted by Lewis, however, gave the dates as 1985–89.

that the restaurant needed to cut back, Lewis believed that the decrease in his hours was because of his seizure disorder.

Lewis first applied for social security benefits in 1991. The Commissioner denied the application without an administrative hearing on June 18, 1991.[3] Lewis did not appeal. He next applied for benefits in September 1992, claiming that he had become unable to work on September 15, 1990. After the Commissioner denied this application, Lewis was granted a June 1994 hearing before an administrative law judge. Five witnesses testified: Lewis, his brother, his sister, his mother, and a vocational expert. The record included documentation of emergency room visits and hospital stays, and notes and reports from three treating physicians—Drs. Dauben, Halcrow, and Duggan. Lewis later supplemented the record with medical records made after the hearing.

To decide if a claimant is entitled to benefits, an ALJ conducts a five-step inquiry. 20 C.F.R. §§ 404.1520 & 416.920. The ALJ first considers whether the claimant is engaged in substantial gainful activity; if not, the ALJ asks in the second step whether the claimant has a severe impairment (i.e., one that significantly affects his or her ability to function); if so, the ALJ asks in the third step whether the claimant's condition meets or equals one of those outlined in the Listing of Impairments in Appendix 1 of the Regulations;[4] if not, then in the fourth step the ALJ asks whether the claimant can perform his or her past relevant work; if not, finally, the ALJ in the fifth step asks whether the claimant can perform other jobs that exist in substantial numbers in the national economy. 20 C.F.R. §§ 404.1520(b)–404.1520(f)(1) & 416.920(b)–416.920(f)(1).

Ten months after the hearing, in May 1995, the ALJ issued a decision that Lewis was not disabled. The ALJ found in favor of Lewis at step one, concluding that his ten hours per week at McDonald's did not constitute substantial gainful activity. Likewise, at step two he found that Lewis's seizure disorder and mild mental retardation in combination were severe as of September 15, 1990. At step three, however, the ALJ determined that Lewis's impairments, either alone or in combination, did not meet or equal any of the conditions outlined in the Listing of Impairments. At steps four and five, the ALJ determined that Lewis, despite severe-to-moderate limits on his working abilities, could perform his then-current work as a McDonald's lot attendant with increased hours, and could perform the jobs cited by the vocational expert, including office helper. The ALJ rejected the family members' testimony that Lewis's medications made him chronically groggy and fatigued. He concluded that Lewis "has not been disabled, as defined in the Social Security Act, at any time through the date of this decision." He thus denied Lewis's application for benefits. Lewis asked the Appeals Council to review the ALJ's decision, but it declined.

With his administrative remedies exhausted, Lewis filed suit in the Central District of California. After consenting to have Magistrate Judge Groh decide the case, the parties filed cross-motions for summary judgment. Magistrate Judge Groh granted the Commissioner's motion and dismissed the complaint with prejudice. In so doing, Magistrate Judge Groh concluded sua sponte that the 1991 application had res judicata effect on the issue of disability through June 1991, and that it created a presumption of continuing non-disability thereafter. This timely appeal followed.

---

**3.** Neither the excerpts of record nor the administrative record filed in the district court contains the 1991 application or the decision denying it. A computer inquiry conducted by the Commissioner, however, showed that the application was denied initially on June 18, 1991, as stated by the ALJ and the magistrate judge, and upon reconsideration on April 8, 1992.

**4.** 20 C.F.R §§ 404.1520(d) & 416.920(d).

## Standard of Review

■■■■ This Court reviews de novo a district court's order upholding the Commissioner's denial of benefits. *Tackett v. Apfel,* 180 F.3d 1094, 1097 (9th Cir.1999). The scope of appellate review, however, is limited: this Court must affirm if substantial evidence supports the Commissioner's decision and if the Commissioner applied the correct legal standards. *Ibid.* Substantial evidence is more than a mere scintilla, but may be less than a preponderance. *Id.* at 1098. Substantial evidence is relevant evidence that, considering the entire record, a reasonable person might accept as adequate to support a conclusion. *Morgan v. Commissioner of Soc. Sec. Admin.,* 169 F.3d 595, 599 (9th Cir.1999). If the evidence can reasonably support either affirmance or reversal, a court may not substitute its judgment for that of the Commissioner. *Tackett,* 180 F.3d at 1098. The ALJ is responsible for determining credibility and resolving conflicts in medical testimony and ambiguities. *Reddick v. Chater,* 157 F.3d 715, 722 (9th Cir.1998).

## Analysis

Lewis raises five issues on appeal: (1) did the ALJ and the magistrate judge err about the relevant time period from which to assess his disability; (2) did the ALJ make adequate credibility findings about the testimony of Lewis's family members; (3) did the ALJ adequately explain his step-three determination that Lewis's impairments did not meet or equal any listed in Appendix 1; (4) did substantial evidence support the ALJ's step-four determination that Lewis could perform his then-current work at McDonald's for more hours; and (5) did substantial evidence support the ALJ's step-five determination that there were jobs that Lewis could perform.

### A. *Period of Alleged Disability*

Lewis contends that the appropriate starting point for assessing his disability was March 1987—not July 1991, as the magistrate judge concluded, or September 15, 1990, as the ALJ concluded.[5] Lewis alleged in his application that the onset date of his disability was September 15, 1990. At his hearing, he moved to change the onset date to March 1987. The ALJ denied the motion, although he considered evidence of disability from before September 1990. The magistrate judge sua sponte held that the denial of Lewis's earlier 1991 application was res judicata on the issue of disability up to the date of denial.

On appeal, Lewis argues that the denial of his 1991 application is not res judicata on the issue of disability because his notice of denial was defective under *Gonzalez v. Sullivan,* 914 F.2d 1197 (9th Cir.1990). *Gonzalez* held that the Commissioner's form notice of an adverse initial determination violated the Due Process Clause because it "[did] not clearly indicate that if no request for reconsideration [was] made, the determination [was] final." *Id.* at 1203.[6] To comply with *Gonzalez,* the Social Security Administration and the Department of Health and Human Services issued Acquiescence Ruling 92–7(9), applicable only in the Ninth Circuit, and only to adverse initial determinations made before July 1, 1991.[7] Acquiescence Ruling 92–

---

5. Lewis alleges error in the ALJ's and magistrate judge's conclusions as to the relevant time period only in his brief's summary of facts and prayer for relief, not in the statement of issues or argument. The Commissioner, however, does not argue that Lewis waived this issue, instead addressing it on the merits.

6. In *Gonzalez,* the defective notice only explained that a failure to request reconsideration of the adverse decision would not bar future applications. It did not explain that the future applications could allege an onset date only *after* the date of the adverse decision. *Ibid.*

7. The ruling was superceded on July 1, 1991, by 42 U.S.C. § 405(b)(3), which provides that determinations may not have res judicata effect if the claimant shows that he or she failed to appeal "in good faith reliance upon incorrect, incomplete, or misleading information, relating to the consequences of reapplying for

7(9) required the Commissioner to reopen an adverse determination upon the request of the recipient of a defective notice.

The parties agree that Lewis received the notice of denial of his 1991 application before July 1, 1991, but there is no evidence that his notice was defective. The notice is not a part of the excerpts of record before this Court; nor was it a part of the administrative record filed with the district court. Lewis is therefore entitled to Acquiescence Ruling 92–7(9) relief only if there is a presumption that notices of denial issued before July 1, 1991, were defective.[8]

■ Although *Gonzalez* likely does not preclude the magistrate judge's res judicata reasoning, this Court nonetheless concludes that the magistrate judge erred in holding that res judicata barred evidence of disability before June 1991. Res judicata does not apply when an ALJ later considers "on the merits" whether the claimant was disabled during an already-adjudicated period. *Lester v. Chater*, 81 F.3d 821, 827 n. 3 (9th Cir.1995). When an ALJ de facto reopens the prior adjudication in that manner, the Commissioner's decision as to the prior period is subject to judicial review. *Ibid.* The ALJ knew of the June 1991 denial of Lewis's 1991 application. Yet he considered evidence of disability from as early as 1989, and he accepted without comment the alleged onset date of September 15, 1990. Under these circumstances it is appropriate for the Court to treat the ALJ's actions as a de facto reopening, and assume a disability

onset date of September 1990, as the ALJ did.

■ Lewis also argues that the ALJ erred in not allowing him to amend his alleged onset date. Lewis first asked to amend his onset date to August 1989, the onset date alleged, Lewis claimed, in the 1991 application. Lewis next asked to amend the alleged onset date to March 1987, a month before Lewis turned 22, so that Lewis could apply for child's benefits on his deceased father's account number. Both requests were made at the hearing.

In his written decision, the ALJ denied the requests to amend on the ground that counsel did not inform the ALJ before the hearing of any change in alleged onset date. The ALJ stated that the necessary development of Lewis's case relating to the requested onset dates had not been completed, and that the record was devoid of a pattern of medical treatment for any complaints from 1987 to 1990. Lewis cites no authority suggesting that the ALJ abused his discretion in denying Lewis's request, or that the Court may even review such a decision. The record, moreover, does not support an onset date of either August 1989 or March 1987. The ALJ did not err in denying Lewis's requests to amend the alleged onset date.

**B.** *Credibility Findings About the Testimony of Lewis's Family Members*

■ Lewis contends that the ALJ failed to make adequate credibility findings in rejecting Lewis's family members' testimony, which described Lewis's severe fatigue and limited ability to function so-

benefits in lieu of seeking review of an adverse determination."

**8.** The Court notes that there are three reasons to conclude that no such presumption exists. First, the ruling states no such presumption. Second, the ruling suggests that post–1989 notices of denial, like Lewis's, may well have differed from that in *Gonzalez*. "The notice language at issue in *Gonzalez*," the Acquiescence Ruling 92–7(9) notes, "was revised in 1989 to explain more clearly the difference between appealing a determination, which

prevents the determination from becoming final, and filing a new application." According to the Ruling, the Social Security Administration finished implementing the new notice language in February 1990, well before Lewis's June 1991 notice of denial. Third, 42 U.S.C. § 405(b)(3), the successor to Acquiescence Ruling 92–7(9), clearly places the burden on the claimant to show that his or her notice was incorrect, incomplete, or misleading.

cially and in work settings. Lay testimony as to a claimant's symptoms is competent evidence that an ALJ must take into account, unless he or she expressly determines to disregard such testimony and gives reasons germane to each witness for doing so. *Nguyen v. Chater*, 100 F.3d 1462, 1467 (9th Cir.1996) (citing *Dodrill v. Shalala*, 12 F.3d 915, 918–19 (9th Cir. 1993)). One reason for which an ALJ may discount lay testimony is that it conflicts with medical evidence. *Vincent v. Heckler*, 739 F.2d 1393, 1395 (9th Cir.1984). The ALJ's decision in this case met these standards.

Lewis's mother testified that, from 1989 to the time of the hearing, Lewis would fall asleep during the day. After daytime petit mal seizures, she testified, Lewis was very groggy and disoriented. She described how his habitual extreme grogginess was beyond that of a simply tired person:

> He'll come over to the house or we'll go someplace together or we'll go in the car someplace and he'll fall asleep. He'll sleep. He comes—His eyes are very, very groggy. Like first of all, like sometimes he's up and you'll look at him and say, oh, he's going to have a good day. And then as the day goes on, within hours, he's more lethargic. He's dragging his feet. Last week, he came with me around my dad's house, dusting and stuff, and he was pretty good. Then by the time we finished the dusting and we went to see my dad and then we went to have dinner at Coco's, by the time dinner was over with, he got up, stood up, was so dizzy I had to help him out of the restaurant. He was like dragging his legs. He went right home and slept. And this is the type of thing that happens I would say daily. He gets very, very lethargic and dizzy. I mean it's not like just tired. You can see the way he kind of shuffles. It's not like a tired person.

Lewis's sister described how Lewis, in 1987–92, was lethargic and detached:

> Very slow. Very slow, lacking energy, lethargic. He doesn't function well. His body doesn't move like you would normally—a person functioning well would. He walks strangely and has his head down. He isn't really aware of what's going on around him.

When Lewis awoke after having had a petit mal seizure in his sleep, she testified, his eyes would be half closed, and he would slouch when he walked. She also testified that when she hired him to do small jobs for her construction company, he had trouble with sequential tasks and could not work independently.

Lewis's brother testified that Lewis had petit mal seizures every night. Afterwards, he told the ALJ, Lewis would have problems with alertness and balance:

> It makes him very groggy when he wakes up from a sleep or a nap, he is not fully alert for a period of time. I've noticed he would get up from a sleep and walk across the apartment to answer the phone or something and he would be—he wouldn't have his balance. He would walk, you know, he would have to hold himself up on the wall sometimes.

Lewis's brother observed that Lewis would suffer from lethargy four or five days per week—and sometimes seven.

The ALJ, however, expressly disregarded the family members' testimony:

> I have carefully considered the testimony of the claimant and the family members in which they indicated that the claimant has been "constantly" groggy and fatigued since 1989. However, the documented medical history and findings and prior recorded statements are contrary to the testimony.

The ALJ analyzed the "documented medical history" to a limited extent, noting only that "during the period of 1990 to 1992, the claimant's disorder was relatively well controlled when he complied with medications, and ... he had no significant adverse side effects." Although the ALJ did not cite the record, it appears that he

was alluding to seven medical reports prepared by Dr. Dauben, one of Lewis's treating physicians, in 1990–92. Each report said that Lewis suffered "no side effects of medication." None of the reports mentioned fatigue or grogginess. The absence of any mention of fatigue, along with the "no side effects" observations in Lewis's 1990–92 medical reports, supported the ALJ's rejection of the family members' testimony that Lewis had suffered chronic fatigue since 1989.

While the ALJ, in dismissing the family members' testimony, did not specify any inconsistent "prior recorded statements," he did note some arguably contradictory testimony at other points in his decision. He observed, for example, that Lewis jogged, golfed, bicycled, played softball once a week, attended church, occasionally bowled with friends, cleaned, and vacuumed. When asked if he was restricting the hours he worked for health reasons, Lewis replied that his hours had been restricted by his employer, and that he was willing to work more. The ALJ also noted inconsistent testimony about Lewis's sleep habits—while Lewis claimed to have insomnia, his mother testified that he slept through the night. In all, the ALJ at least noted arguably germane reasons for dismissing the family members' testimony, even if he did not clearly link his determination to those reasons. Substantial evidence supported the ALJ's decision to discount the family members' testimony.

C. *The ALJ's Explanation of His Step–Three Determination that Lewis's Impairments Did Not Meet or Equal Any of Those Listed in Appendix 1*

■ If a claimant has an impairment or combination of impairments that meets

or equals a condition outlined in the "Listing of Impairments," then the claimant is presumed disabled at step three, and the ALJ need not make any specific finding as to his or her ability to perform past relevant work or any other jobs. 20 C.F.R. § 404.1520(d). An ALJ must evaluate the relevant evidence before concluding that a claimant's impairments do not meet or equal a listed impairment. A boilerplate finding is insufficient to support a conclusion that a claimant's impairment does not do so. *See Marcia v. Sullivan,* 900 F.2d 172, 176 (9th Cir.1990) (holding that ALJ erred by failing to consider evidence of equivalence).

■ During the hearing, the ALJ noted his impression that Lewis's condition had worsened since 1992, and said that he was not at that time "foreclosing any meeting or equalling [sic] the level of severity of the listed impairment." Nevertheless, in his written decision, the ALJ concluded that Lewis's impairments did not meet or equal a listed impairment:

> As of the claimant's alleged onset date, his disorders in combination were severe: mild mental retardation and seizure disorder. He does not have an impairment or combination of impairments listed in or medically equal to one listed in the regulations.

Lewis contends that the ALJ erred under *Marcia* by failing to elaborate on his determination that Lewis's seizure disorder and mental retardation did not meet or equal an impairment listed in Appendix 1.[9]

Epilepsy is a listed impairment evaluated according to the type, frequency, duration, and after-effect of seizures.[10] 20

---

9. Lewis does not allege that the ALJ erred in rejecting the opinion of Lewis's treating psychologist that Lewis met the listed criteria for Organic Personality Disorder.

10. The two epilepsy listings from Appendix 1 concern grand-mal and petit-mal variants of epilepsy:

11.02 Epilepsy—major motor seizures, (grand mal or psychomotor), documented by EEG and by detailed description of a typical seizure pattern, including all associated phenomena; occurring more frequently than once a month, in spite of at least 3 months of prescribed treatment. With:

C.F.R. Pt. 404, Subpt. P, App. 1, §§ 11.02 & 11.03. The ALJ did not make findings, as Lewis correctly notes, as to the nature and extent of each type of seizure noted in Lewis's medical records. Nor did he make findings as to whether Lewis had nighttime seizures that affected his daytime activity. Finally, the ALJ did not make findings as to the average frequency of Lewis's grand mal or petit mal seizures. These omissions might have required reversal or remand under *Marcia* were it not for the ALJ's finding that Lewis's seizures were largely a result of noncompliance with his prescribed therapy.

A claimant's impairment does not meet the epilepsy listing unless it "persists despite the fact that the individual is following prescribed anticonvulsive treatment." 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 11.00A. An ALJ can ordinarily determine whether a claimant is adhering to his or her prescribed therapy from objective clinical findings in the treating physician's report. *Ibid.* An ALJ cannot allow a claim under the epilepsy listing without a record of anticonvulsant blood levels. Social Security Ruling 87–6 (1987). The ALJ must evaluate blood drug levels along with all other evidence to determine the extent of the claimant's compliance with treatment. 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 11.00A.

The ALJ concluded that when Lewis took his medication, his condition was well controlled. Although he did not recite it in his decision's brief "Findings," the ALJ did note in his "Statement of the Case" repeated evidence that Lewis did not comply with his prescribed treatment. During Lewis's April 1990 hospitalization, the ALJ noted, "testing disclosed that he had a low Tegretol level of only '1.0.'" The ALJ re-

lied on similar evidence of subtherapeutic drug blood levels for seizures in May 1991 and November 1993.

The ALJ also noted other evidence of noncompliance. Before his April 1990 hospitalization, Lewis had been drinking beer, contrary to prior medical instructions. Lewis himself reported that he had not taken Klonopin for several days before his hospitalization in September 1990, and that he had missed medications in March 1991. In 1990, Dr. Dauben noted that "when [Lewis] takes his medication he is under good control. He has had several episodes where he missed medication and had seizures." In March 1991, Dr. Halcrow, another treating physician, reported that Lewis had a recurrent problem with compliance:

> There apparently had been a recurrent problem with good patient compliance. At one point, it became evident that dexedrine which had been prescribed for the patient, had been sold by the patient's roommates. Nevertheless, the seizures have been under reasonable control in the immediate past.

The ALJ thus discussed and evaluated evidence supporting his conclusion that Lewis's symptoms did not persist when he took his medication. *Marcia* simply requires an ALJ to discuss and evaluate the evidence that supports his or her conclusion; it does not specify that the ALJ must do so under the heading "Findings."

As Lewis correctly points out, the ALJ did not mention that Dr. Dauben commented in a July 20, 1994, letter that "[u]nfortunately this patient's seizures have not been fully controlled despite therapeutic levels of Tegretol, Depakote, and Klonopin." This omission did not rise to the level of error. Because the evidence of

---

A. Daytime episodes (loss of consciousness and convulsive seizures) or

B. Nocturnal episodes manifesting residuals which interfere significantly with activity during the day.

11.03 Epilepsy—Minor motor seizures (petit mal, psychomotor, or focal), documented by EEG and by detailed description of a

typical seizure pattern, including all associated phenomena; occurring more frequently than once weekly in spite of at least 3 months of prescribed treatment. With alteration of awareness or loss of consciousness and transient postictal manifestations of unconventional behavior or significant interference with activity during the day.

Lewis's compliance conflicted, the ALJ could conclude that Lewis failed to take his medications, so long as substantial evidence supported that conclusion, as it did. Moreover, Dr. Dauben had not made his July 20, 1994, statement in the course of treatment—it was in a "To whom it may concern" letter that did not address whether Lewis consistently complied with his prescribed regime of "therapeutic levels" of medication. The ALJ found, with adequate explanation and record support, that Lewis did not consistently comply with his regime, and that his seizures tended to occur when he did not comply.

■ The ALJ also sufficiently discussed and evaluated the evidence before concluding that Lewis did not meet the listing for mental retardation. A claimant can only meet that listing if he or she has verbal, performance or full scale IQ of 70 or less along with some additional impairment, or a full scale IQ of 59 or less. 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.05. The ALJ noted that Lewis had a full scale IQ of 78, and a performance IQ of 81. These scores were well above the maximum IQ of 70 allowed by the listing. This alone, apart from the ALJ's discussion of Lewis's practical capabilities, sufficed to explain his conclusion.

■ The next issue is whether the ALJ adequately explained his finding that Lewis's impairments did not *equal* a listed impairment. If a claimant's impairment does not meet the criteria specified in the listings, he or she is still disabled if the impairment equals a listed impairment. 20 C.F.R. § 404.1520(d). If a claimant has more than one impairment, the Commissioner must determine "whether the combination of [the] impairments is medically equal to any listed impairment." 20 C.F.R. § 404.1526(a). The claimant's symptoms "must be considered in combination and must not be fragmentized in evaluating their effects." *Lester v. Chater,* 81 F.3d 821, 829 (9th Cir.1995) (citations omitted). A finding of equivalence must

be based on medical evidence only. 20 C.F.R. § 404.1529(d)(3).

The ALJ did not discuss the combined effects of Lewis's impairments, or compare them to any listing. Unlike the claimants in *Lester* and *Marcia,* however, Lewis has offered no theory, plausible or otherwise, as to how his seizure disorder and mental retardation combined to equal a listed impairment. Nor has he pointed to evidence that shows that his combined impairments equal a listed impairment. He has shown no evidence that his seizures had even a temporary effect of lowering his IQ. He might have argued that grogginess from his medications and seizures exacerbated the effect of his mental retardation, but the ALJ explicitly rejected Lewis's claim of grogginess. Likewise, Lewis has pointed to no evidence that his mental retardation exacerbated his seizure disorder. Nothing in the regulations, moreover, says a claimant may circumvent the compliance requirement of the epilepsy listings by "equaling" rather than "meeting" the listing. The ALJ did not err in concluding that Lewis's conditions did not equal a listed impairment.

■ Lewis also argues that the ALJ erred when, after having commented that he had not ruled out the possibility that Lewis's impairments met or equaled a listed impairment, he did not seek additional medical evidence. The authorities cited by Lewis are not on point. In *Smolen v. Chater,* 80 F.3d 1273, 1288 (9th Cir.1996), an ALJ erred by rejecting a physician's opinions for lack of foundation instead of further developing the record so that he could properly evaluate the opinions. Here, the ALJ did not indicate that he found the record insufficient to properly evaluate the evidence.

Section 404.1527(c)(3) of the regulations, also cited by Lewis, likewise does not apply. The section provides for gathering additional evidence only if the evidence already present consistently favors the claimant: "[i]f the evidence is consistent but we do not have sufficient evidence to

decide whether you are disabled, or if after weighing the evidence we decide we cannot reach a conclusion about whether you are disabled, we will try to obtain additional evidence." Here the evidence did not consistently favor a finding of disability. As discussed above, there was substantial evidence that Lewis did not comply with his prescribed medical regime. Moreover, the undisputed evidence showed that his IQ was not as low as 70. The ALJ did not err by not seeking more medical evidence.

### D. *The ALJ's Step–Four Determination*

At step four, the claimant bears the burden of showing that he or she does not have the residual functional capacity to engage in "past relevant work." 20 C.F.R. §§ 404.1520(e) & 416.920(e); *Tackett,* 180 F.3d at 1098. A job qualifies as past relevant work only if it involved substantial gainful activity. *See* 20 C.F.R. §§ 404.1560, 404.1565, 416.960 & 416.965. If a claimant can perform his or her past relevant work, then he or she is not disabled. If not, or if he or she did not do past relevant work, then the ALJ moves to step five, in which he or she determines if the claimant has the residual functional capacity to do other substantial gainful work.

 Substantial gainful activity is work done for pay or profit that involves significant mental or physical activities. 20 C.F.R. §§ 404.1571–404.1572 & 416.971–416.975. Earnings can be a presumptive, but not conclusive, sign of whether a job is substantial gainful activity. Monthly earnings averaging less than $300 generally show that a claimant has not engaged in substantial gainful activity. 20 C.F.R. §§ 404.1574(b)(3) & 416.974(b)(3). At the other end of the spectrum, monthly earnings averaging more than $500 generally show that a claimant *has* engaged in substantial gainful

activity. 20 C.F.R. §§ 404.1574(b)(2) & 416.974(b)(2). (If a claimant's average monthly earnings fall between $300 and $500, then the Commissioner will consider other information listed in the regulations.)

While he did not use the term "past relevant work," the ALJ clearly found that Lewis's past work of twenty hours per week at McDonald's was substantial and gainful, and that Lewis had the residual functional capacity to do that work: "[t]he evidence fails to establish that the claimant is unable to continue working in his current occupation with increased work hours, (up to 20 hours per week) consistent with the regulations relative to gainful work activity." These findings were equivalent to a finding that Lewis was not disabled, or entitled to benefits. On appeal, Lewis argues that his average monthly earnings during the alleged period of disability created an unrebutted presumption that he had not, contrary to the ALJ's finding, engaged in substantial gainful activity. During his alleged period of disability, Lewis's annual earnings always averaged less than $300 per month.[11]

 The presumption that arises from low earnings shifts the step-four burden of proof from the claimant to the Commissioner. Without the presumption, the claimant must produce evidence that he or she has not engaged in substantial gainful activity; if there is no such evidence, the ALJ may find that the claimant has engaged in such work. With the presumption, the claimant has carried his or her burden unless the ALJ points to substantial evidence, aside from earnings, that the claimant *has* engaged in substantial gainful activity. The regulations list five factors: the nature of the claimant's work, how well the claimant does the work, if the work is done under special conditions, if the claimant is self-employed, and the amount of time the claimant spends at

---

11. In 1990, Lewis earned an average of $289.66 per month; in 1991, it was $168.30 per month; in 1992, $188.92; in 1993, $80.02; and in 1994, up to the date of the hearing, about $63 per month.

work. 20 C.F.R. §§ 404.1573 & 416.973. *See Katz v. Secretary of Health and Human Servs.*, 972 F.2d 290, 293 (9th Cir. 1992) (citing regulations and listing these as factors that claimant could use to overcome high-earnings presumption). Generally, an ALJ should not consider activities like taking care of oneself, household tasks, hobbies, school attendance, club activities, or social programs to be substantial gainful activities. 20 C.F.R. §§ 404.1572(c) & 416.972(c).

■ Here, the ALJ concluded that Lewis had engaged in substantial gainful activity based on evidence that he had occasionally worked twenty hours per week during the period of alleged disability, and on Lewis's statement that he had not cut back his hours at McDonald's for health reasons. This evidence did not substantially support the ALJ's conclusion.

As an initial matter, the fact that Lewis worked twenty hours per week for short periods in the past did not show that he could work twenty hours per week on a sustained basis. The ALJ must inquire whether the claimant has "residual functional capacity for work activity *on a regular and continuing basis.*" 20 C.F.R. §§ 404.1545 & 416.945 (emphasis added). "Occasional symptom-free periods—and even the sporadic ability to work—are not inconsistent with disability." *Lester,* 81 F.3d at 833. Here, the evidence showed that Lewis had worked up to twenty hours per week, but not often. His work at the twenty-hour level lasted only two months at McDonald's. This period of work was not substantial evidence that Lewis could work twenty hours per week "on a regular and continuing basis." In all, the time-spent-working factor weighed against a finding that Lewis had engaged in substantial gainful activity.

■ Nor did Lewis's testimony about his decreased hours at McDonald's ade-

quately rebut the earnings presumption. Lewis testified that he would have worked more hours if available, and that he was not self-restricting his hours for health reasons. In light of the entire record, Lewis's willingness to work more hours was not substantial evidence that he actually could work for twenty hours per week on a sustained basis. During his tenure at McDonald's, Lewis was sent home four times for grogginess and two or three times for seizures. He was criticized for his work performance. He only worked twenty hours per week at McDonald's for two months. When asked why his hours were decreased, Lewis testified as follows:

Q: All right, can you tell us why you believe they've lowered your hours?

A: I've talked to the owner of McDonald's and he said that they needed to cut back so to speak.

Q: And you believe that that's, do you have another feeling as to why—

A: I think it's because of my epilepsy, my seizure disorder.

Under these circumstances, Lewis's testimony was not substantial evidence that he had engaged in substantial gainful activity, or that he has the residual functional capacity to engage in substantial gainful activity.[12]

The remaining factors listed in the regulations either were not relevant or favored a decision that Lewis had not engaged in substantial gainful activity. Lewis's past jobs included working for his sister doing simple tasks, working as a box boy at a supermarket, working as a napkin/silverware wrapper at a Red Lobster restaurant, and working as a lobby-and-lot attendant at McDonalds. These were uncomplicated entry-level jobs. None involved supervising others, and none contributed substantially to the operations of the businesses. *See* 20 C.F.R. §§ 404.1573(a) & 416.973(a). The only evi-

12. A claimant's willingness to work more hours is not, of course, evidence of past relevant work.

idence of how well Lewis performed his jobs was his sister's testimony that he needed constant supervision and Lewis's testimony that he was criticized at McDonald's for his job performance. *See* 20 C.F.R. §§ 404.1573(b) & 416.973(b).

The Commissioner did not rebut the presumption that Lewis had not engaged in substantial gainful activity, and thus had not engaged in past relevant work. The ALJ erred at step four.

E. *The ALJ's Step–Five Determination*

█ If a claimant does not have the residual functional capacity to perform past relevant work, then it is the Commissioner's burden at step five to establish that the claimant can perform other work. *Gamer v. Secretary of Health and Human Servs.*, 815 F.2d 1275, 1278, 1279 (9th Cir. 1987). The ALJ may use a vocational expert, as did the ALJ in this case, to determine whether a claimant can use his or her work skills in other work. 20 C.F.R. §§ 404.1566(e) & 416.966(e). Hypothetical questions asked of the vocational expert must "set out all of the claimant's impairments." *Gamer*, 815 F.2d at 1279. If the record does not support the assumptions in the hypothetical, the vocational expert's opinion has no evidentiary value. *Ibid.*

Lewis argues that the ALJ erred by relying on the vocational expert's response to a hypothetical that did not include written comments by Lewis's treating psychologist, Dr. Duggan. The comments, written by hand on an assessment form, described how Lewis's organic personality disorder limited his work and social capabilities:

Pt shows very poor social perception and judgment which results in inappropriate actions often leading to problems in both

work and social life. This seems directly related to his Organic Personality Disorder (310.10), secondary to epilepsy.

* * * * * *

Pt keeps self clean and is reliable as long .as schedule is clear, nuances and changes cause problems.

When counsel added Dr. Duggan's comments to the hypothetical, the vocational expert testified that Lewis could not perform the jobs she had previously identified.

█ In his written decision, the ALJ rejected Dr. Duggan's opinion that Lewis's disability caused him to display very poor judgment in social and work situations. But an ALJ may reject a treating doctor's medical opinion, if no other doctor has contradicted it, only for "clear and convincing" reasons supported by substantial evidence. *Reddick*, 157 F.3d at 725. No other doctor contradicted Dr. Duggan's assessment of Lewis.

█ Nor were the ALJ's reasons for rejecting Dr. Duggan's opinion clear and convincing.[13] The ALJ noted that Lewis maintained close relationships with family members, maintained friendships, and participated in some group sports. The ALJ also stated that Dr. Duggan had not treated Lewis in three years, and had not referred him for more intensive treatment.

Lewis's ability to maintain close relationships with his family members and friends is not the same as being able to work with people who are less likely to know about or understand his limitations. And Lewis's participation in group sports was not like sustained work in terms of time or expectations. Lewis's family relationships and his athletic activities were not clear and convincing evidence that, contrary to Dr. Duggan's opinion, he could function normally in work and social settings.

13. The Commissioner argues that the ALJ was supported by substantial evidence in rejecting Dr. Duggan's opinion that Lewis met the listing for Organic Personality Disorder. This issue was not raised by Lewis on appeal, and this opinion therefore does not address the Commissioner's argument. Lewis challenges only the ALJ's failure to include Dr. Duggan's comments in the hypothetical to the vocational expert.

The ALJ's statement that Dr. Duggan had not treated Lewis in three years, moreover, was misleading. Dr. Duggan formally treated Lewis in 1990–91, for a total of approximately 62 visits. Dr. Duggan discharged Lewis after it became clear to him that Lewis's "organic impairment set a ceiling on the progress he was going to make." Lewis kept in touch with Dr. Duggan by phone, however, approximately once per week through the date of the hearing. And Dr. Duggan saw Lewis many times from 1992–93. His opinion was not based on a cold record. Nor, given his reason for discharging Lewis, could the ALJ legitimately infer that Dr. Duggan's reason for not referring Lewis to more intensive treatment was that Lewis's impairments were mild or improved.

In light of the vocational expert's response to the hypothetical that included Dr. Duggan's comments, the ALJ erred in concluding that Lewis could perform other jobs that existed in substantial numbers in the national economy.

### Conclusion

The ALJ erred at steps four and five in concluding that Lewis could perform his past relevant work as a McDonald's lot-and-lobby attendant for 20 hours per week, and that he could perform the other jobs identified by the vocational expert. This Court therefore reverses the magistrate judge's order dismissing Lewis's suit and remands the case to the magistrate judge with instructions to remand the matter to the Commissioner with instructions for the Commissioner to calculate and award benefits with an onset date of September 15, 1990. *See Smolen,* 80 F.3d at 1292 (noting discretion to remand for "an award of benefits where the record has been fully developed and where further administrative proceedings would serve no useful purpose" (citation omitted)).

**REVERSED AND REMANDED.**