**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

BRENDA M. DIEDRICH,
*Plaintiff-Appellant*,

v.

NANCY A. BERRYHILL, Acting
Commissioner Social Security,
*Defendant-Appellee.*

No. 14-36070

D.C. No.
6:13-cv-01501-
CL

OPINION

Appeal from the United States District Court
for the District of Oregon
Owen M. Panner, Senior District Judge, Presiding

Argued and Submitted June 5, 2017
Portland, Oregon

Filed October 26, 2017

Before:  A. Wallace Tashima, Ronald M. Gould,
and Johnnie B. Rawlinson, Circuit Judges.

Opinion by Judge Gould;
Dissent by Judge Rawlinson

# SUMMARY[*]

## Social Security

The panel affirmed in part, and reversed in part, the district court's order affirming the Commissioner of Social Security's denial of claimant's application for Social Security Disability Insurance ("SSDI") benefits under Title II of the Social Security Act.

Unlike Supplemental Security Income benefits under Title XVI of the Social Security Act, SSDI benefits are limited to a certain period of insurance determined by the amount of claimant's previously taxed earnings. The Commissioner determined that claimant had become disabled but an administrative law judge ("ALJ") found that her disability did not begin during the period in which she was insured for SSDI benefits.

The panel held that the ALJ erred by not calling a medical advisor at the hearing, by giving too little weight to the observations of claimant's fiancé, and by finding that claimant was only partially credible. Specifically, the panel held that pursuant to Social Security Ruling 83-20, the Commissioner erred by not calling a medical advisor at the hearing to help determine the precise onset date of claimant's disability under the circumstances – namely, there were large gaps in the medical records documenting a slowly progressive impairment, and an ALJ's assessment of the disability onset date would be mere speculation without

---

[*] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

the aid of a medical expert. Concerning the ALJ's finding that claimant's fiancé's observations merited "little weight," the panel held that none of the ALJ's three reasons for discounting the observations were germane. Concerning the ALJ's finding that claimant was only a "partially credible witness," the panel held none of the ALJ's given reasons – that reports by an orthopedist and therapist did not mention mental health symptoms, that there were no observations of claimant's different personalities, and that claimant's daily activities involved a wide range of activities – was clear and convincing.

The panel concluded that none of the ALJ's errors were harmless. The panel remanded for further proceedings with instructions that the ALJ's decision be vacated, and that the district court remand to the ALJ with instructions that the ALJ should call a medical advisor and proceed in a manner consistent with this opinion.

Judge Rawlinson dissented because, applying the deferential substantial evidence standard of review, she agreed with the magistrate judge and the district court that the ALJ's decision was free of legal error and supported by substantial evidence.

**COUNSEL**

Max Rae (argued), Salem, Oregon, for Plaintiff-Appellant.

David Burdett (argued) and John C. Lamont, Special Assistant United States Attorneys; Adrian Lee Brown, Assistant United States Attorney; David Morado, Regional Chief Counsel, Region X; Office of the General Counsel, Social Security Administration, Seattle, Washington; for Defendant-Appellee.

**OPINION**

GOULD, Circuit Judge:

Brenda M. Diedrich appeals the district court's order affirming the Commissioner of Social Security's (the "Commissioner") denial of Diedrich's application for Social Security Disability Insurance ("SSDI") benefits under Title II of the Social Security Act. The Commissioner determined that Diedrich had become disabled, but an Administrative Law Judge ("ALJ") found that her disability did not begin during the period in which she was insured for SSDI benefits. We hold that the ALJ erred in its assessment (1) by not calling a medical advisor at the hearing; (2) by giving too little weight to the observations of Diedrich's fiancé; and (3) by finding that Diedrich was only partially credible. We reverse in part on these grounds, and remand. In a separately filed memorandum disposition, we reject several other challenges Diedrich raises related to the ALJ's decision, affirming in part the ALJ's decision.

## I

We consider a claimant with a troubled past and serious medical conditions.  Brenda Diedrich had a rough childhood: Her upbringing was marred by drug addiction, sexual and emotional abuse from her father, suicide attempts, and a marriage at seventeen that resulted in domestic violence. Since 2002, Diedrich has been arrested at least six times, and has been jailed twice.  This background doubtless plays some role in her medical conditions.

Diedrich has applied for disability benefits several times. At issue in this appeal is her third application, filed on August 26, 2009, seeking both SSDI benefits under Title II of the Social Security Act and Supplemental Security Income ("SSI") benefits under Title XVI of the act.  *See* 42 U.S.C. §§ 401 *et seq.* (Title II), 1381 *et seq.* (Title XVI).

SSI benefits are based on needs.  To be eligible, a claimant must be "aged, blind or disabled," and must have income and resources under certain thresholds.  *See id.* § 1382(a).  In contrast, SSDI benefits are based on earnings. The claimant must be disabled, and must have contributed to a federal insurance trust fund through deductions in his or her wages.  *See id.* § 401(b); *see generally Bowen v. Galbreath*, 485 U.S. 74, 75 (1988).  Unlike SSI benefits, SSDI benefits are limited to a certain period of insurance. The length of this insured period is determined by the amount of the claimant's previously taxed earnings.  *See* 42 U.S.C. § 423(c)(1).  The definition of "disability" for SSI benefits is the same as for SSDI benefits.  *Compare* 42 U.S.C.  § 423(d)(1)(A)  (Title  II),  *with  id.* § 1382c(a)(3)(A) (Title XVI).

On January 29, 2010, a Disability Determination Services ("DDS") psychological consultant concluded that

as of the date of Diedrich's third application, August 26, 2009, Diedrich was disabled due to bipolar and anxiety disorders. This entitled Diedrich to SSI benefits. But Diedrich had not been insured for SSDI benefits since June 30, 2008. Because the psychological consultant concluded that Diedrich's disability began after June 30, 2008, Diedrich's application for SSDI benefits was denied.

Diedrich sought administrative review of this denial of SSDI benefits. She argued that the psychological consultant determined the wrong onset date of her disability. Specifically, she claimed that her disability began not on August 26, 2009, but much earlier, on October 1, 2002. Diedrich asserted that because her disability began before her Title II insurance expired on June 30, 2008, she was entitled to SSDI benefits.

On December 14, 2011, an ALJ held a hearing on Diedrich's benefits denial. The relevant evidence at the hearing included medical records from several of Diedrich's treating physicians. These records showed that, in addition to certain physical conditions, as early as July 2003 Diedrich suffered serious mental health symptoms. These symptoms included periods of extreme hyperactivity and recklessness, volatile moods, weeks-long bouts of depression, hallucinations, memory problems, trouble concentrating, panic attacks, social anxiety, and blackouts during which Diedrich would experience personality changes. At various points, Diedrich's doctors have diagnosed her with bipolar disorder, depression, attention deficit disorder, post-traumatic stress disorder, agoraphobia, and split personalities, among other conditions.

Diedrich testified at the hearing. She described how her mental health symptoms hampered her functioning in daily life. Diedrich's fiancé, David Niebaum, also testified. He

explained that he had known Diedrich since the end of September 2008 and saw her every day. He described how Diedrich would experience manic-depressive cycles and take on alternate personalities. Niebaum also submitted a third-party function report, in which he explained how Diedrich's inability to maintain a routine, mood swings, poor memory, trouble concentrating, anxiety, and other symptoms left her dependent on him for daily help. A vocational expert testified at the hearing as well, but the ALJ did not call a medical advisor.

The ALJ denied SSDI benefits for Diedrich. The ALJ gave "little weight" to Niebaum's observations, and found that Diedrich was merely a "partially credible witness." The ALJ concluded that Diedrich was "not under a disability . . . at any time from October 1, 2002, the alleged onset date, through June 30, 2008, the date last insured." Diedrich filed this action in the district court, seeking review of the Commissioner's final decision that denied Diedrich SSDI benefits. A magistrate judge recommended that the Commissioner's decision be affirmed. The district court adopted the Findings and Recommendations of the magistrate judge, affirmed the Commissioner's decision, and dismissed the case. Diedrich timely appealed.

## II

We have jurisdiction to decide this appeal under 28 U.S.C. § 1291. We review *de novo* the district court's decision affirming the Commissioner's denial of benefits. *Stout v. Comm'r, Soc. Sec. Admin.*, 454 F.3d 1050, 1052 (9th Cir. 2006). We may set aside the Commissioner's benefits denial if the ALJ committed legal error or reached a decision not supported by substantial evidence. *Id.*

## III

### A

Diedrich contends that the ALJ committed legal error by not calling a medical advisor at the hearing.  She argues that a medical advisor was necessary to help the ALJ sift through her voluminous medical records and determine the correct onset date of her disability.

The ALJ is responsible for studying the record and resolving any conflicts or ambiguities in it.  *Treichler v. Comm'r of Soc. Sec. Admin.*, 775 F.3d 1090, 1098 (9th Cir. 2014).  But in circumstances where the ALJ must determine the date of disability onset and medical evidence from the relevant time period is unavailable or inadequate, Social Security Ruling ("SSR") 83-20 states that the ALJ should call a medical advisor.  "Social Security Rulings [] do not carry the 'force of law,' but they are binding on ALJs nonetheless.  They reflect the official interpretation of the [Social Security Administration] and are entitled to some deference as long as they are consistent with the Social Security Act and regulations."  *Molina v. Astrue*, 674 F.3d 1104, 1113 n.5 (9th Cir. 2012) (internal quotation marks and citation omitted).

In relevant part, SSR 83-20 states:

> With slowly progressive impairments, it is sometimes impossible to obtain medical evidence establishing the precise date an impairment became disabling.  Determining the proper onset date is particularly difficult, when, for example, the alleged onset and the date last worked are far in the past and adequate medical records are not available.

> In such cases, it will be necessary to infer the onset date . . . .
>
> . . . .
>
> At the hearing, the [ALJ] should call on the services of a medical advisor when onset must be inferred.

Relying on SSR 83-20, we have held that where a record is lacking and ambiguous as to the onset date of disability, "the ALJ must call a medical expert to assist in determining the onset date." *Armstrong v. Comm'r of Soc. Sec. Admin.*, 160 F.3d 587, 590 (9th Cir. 1998); *see also DeLorme v. Sullivan*, 924 F.2d 841, 848 (9th Cir. 1991) ("In the event that the medical evidence is not definite concerning the onset date and medical inferences need to be made, SSR 83-20 requires the administrative law judge to call upon the services of a medical advisor and to obtain all evidence which is available to make the determination."); *Morgan v. Sullivan*, 945 F.2d 1079, 1083 (9th Cir.1991) (per curiam) (reversing in part an ALJ's determination of the onset date of mental disorders because the ALJ did not receive the assistance of a medical advisor).

This requirement makes sense. Sometimes, the onset of disabilities occurs all at once, and the date of onset is clear. For example, when a claimant is permanently injured in a car wreck, there is rarely a dispute over the date of the crash. But sometimes conditions build slowly over time. In such cases, it helps to have medical expertise to determine when the symptoms became severe enough so that the claimant became disabled under Title II. *See Morgan*, 945 F.2d at 1081.

Here, the record shows that Diedrich did not see a psychologist until years after her alleged onset date; there are no mental health records for nearly two years surrounding her date last insured, and the next available records supported a finding of disability; and she suffered inconsistent but increasingly severe symptoms over the seven years between her alleged onset date and the disability onset date found by the Commissioner. Because "the alleged onset and the date last worked are far in the past and adequate medical records are not available," determining the precise date on which Diedrich became disabled required an informed inference. "Such an inference is not possible without the assistance of a medical expert." *Id.* at 1083.

The Commissioner relies on *Sam v. Astrue* to argue that SSR 83-20 is inapplicable. 550 F.3d 808 (9th Cir. 2008) (per curiam). In *Sam*, we held "that SSR 83-20 does not require a medical expert where the ALJ explicitly finds that the claimant has never been disabled." 550 F.3d at 809. But the ALJ here did not find that Diedrich was never disabled. In fact, the ALJ could not have made such a finding because Diedrich was already found disabled as of her SSI and SSDI application date, August 26, 2009. Rather, the ALJ concluded that Diedrich was "not under a disability . . . at any time from October 1, 2002, the alleged onset date, through June 30, 2008, the date last insured." This differs from the case in *Sam*, where the ALJ concluded that the claimant "was not under a 'disability' . . . at any time through the date of [the ALJ's] decision." *Id.* at 810 (internal quotation marks omitted). We conclude that *Sam* does not control here.

Finally, the district court held that the ALJ did not need to call a medical advisor because psychological consultants examined Diedrich's medical records in reaching Diedrich's

initial denial of SSDI benefits. But SSR 83-20 states that the ALJ should call a medical advisor "[a]t the hearing." It does not say that the ALJ should rely on the previous work of DDS consultants. Moreover, if analysis from DDS consultants was a sufficient substitute for the testimony of a medical advisor, then SSR 83-20 would be superfluous. Applications for benefits are ordinarily reviewed by a consultant long before an ALJ gets involved. Relying on the initial review of DDS consultants also presents the practical problem that those consultants do not have before them the same record as the ALJ. In particular, such consultants do not have access to the later-in-time testimony given at the hearing. The consultant here, for example, did not have access to the hearing testimony of either Diedrich or of Niebaum because that testimony had not yet been given.

We hold that the Commissioner erred by not calling a medical advisor at the hearing to help determine the precise onset date of Diedrich's disability under these circumstances—that is, where there are large gaps in the medical records documenting a slowly progressive impairment and an ALJ's assessment of the disability onset date would be mere speculation without the aid of a medical expert. Even with a medical advisor, the date of onset of disability in this challenging case might have remained somewhat debatable and mysterious. But with testimony from a medical advisor, at least the ALJ could exercise an informed judgment based on medical science.

## B

We next address Diedrich's contention that the ALJ erred by giving "little weight" to Niebaum's observations. "Lay testimony as to a claimant's symptoms is competent evidence that an ALJ must take into account, unless he or she expressly determines to disregard such testimony and

gives reasons germane to each witness for doing so." *Lewis v. Apfel*, 236 F.3d 503, 511 (9th Cir. 2001). The ALJ listed three reasons for giving Niebaum's observations "little weight": (1) Niebaum had a close relationship with Diedrich, which "likely influenced his opinion;" (2) the "overall medical evidence" did not support Niebaum's observations; and (3) Niebaum's observations did not begin until September 2008, three month after Diedrich's insurance for SSDI benefits expired. We conclude that each of these reasons is not germane as a reason to disregard Niebaum's observations.

First, Niebaum's personal relationship with Diedrich is not a valid reason to discount his observations. To do so "contradicts our insistence that, regardless of whether they are interested parties, friends and family members in a position to observe a claimant's symptoms and daily activities are competent to testify as to his or her condition." *Valentine v. Comm'r Soc. Sec. Admin.*, 574 F.3d 685, 694 (9th Cir. 2009) (internal quotation marks omitted); *see also Smolen v. Chater*, 80 F.3d 1273, 1289 (9th Cir. 1996) ("The fact that a lay witness is a family member cannot be a ground for rejecting his or her testimony. To the contrary, testimony from lay witnesses who see the claimant every day is of particular value; such lay witnesses will often be family members." (citation omitted)). Niebaum's close relationship with Diedrich is not a germane reason to discount the weight of his observations.

Second, a lack of support from the "overall medical evidence" is also not a proper basis for disregarding Niebaum's observations. *See Bruce v. Astrue*, 557 F.3d 1113, 1116 (9th Cir. 2009) ("Nor under our law could the ALJ discredit [the witness's] lay testimony as not supported by medical evidence in the record."). The fact that lay

testimony and third-party function reports may offer a different perspective than medical records alone is precisely why such evidence is valuable at a hearing. *See Smolen*, 80 F.3d at 1289 (holding that ALJ erred where the ALJ rejected the testimony of claimant's family members about claimant's symptoms because the medical records did not corroborate those symptoms). A lack of support from medical records is not a germane reason to give "little weight" to those observations.

Third, although Niebaum's observations began three months after Diedrich's insured period ended, his observations are still relevant to show Diedrich's symptoms during that period. Absent a reason to think Diedrich experienced a major symptom change in the three months before she met Niebaum, it is a fair and reasonable inference that the symptoms Niebaum observed were substantially similar to the symptoms Diedrich experienced before June 30, 2008. *See Tobeler v. Colvin*, 749 F.3d 830, 833 (9th Cir. 2014) ("[Lay witness's] statement that [claimant] was incapable of working in 2001 is relevant to his ability to work in 1999, at least in the absence of any evidence that [claimant's] condition worsened between 1999 and 2001."); *cf. Lester v. Chater*, 81 F.3d 821, 832 (9th Cir. 1995) ("[M]edical evaluations made after the expiration of a claimant's insured status are relevant to an evaluation of the preexpiration condition." (internal quotation marks omitted)), *as amended* (Apr. 9, 1996). That Niebaum's observations began three months after Diedrich's insured period ended is not a germane reason to give those observations "little weight."

We conclude that none of the ALJ's three reasons for discounting Niebaum's observations is germane. We hold

that the ALJ erred by giving "little weight" to Niebaum's observations.

## C

Finally, we address Diedrich's contention that the ALJ erred in finding that she was a "partially credible witness."

> In assessing the credibility of a claimant's testimony regarding subjective pain or the intensity of symptoms, the ALJ engages in a two-step analysis. First, the ALJ must determine whether there is objective medical evidence of an underlying impairment which could reasonably be expected to produce the pain or other symptoms alleged. If the claimant has presented such evidence, and there is no evidence of malingering, then the ALJ must give specific, clear and convincing reasons in order to reject the claimant's testimony about the severity of the symptoms.

*Molina*, 674 F.3d at 1112 (internal quotation marks and citations omitted). The ALJ gave four reasons for finding Diedrich's testimony about the severity of her symptoms only "partially credible": (1) Dr. Terri Robinson, an orthopedist who treated Diedrich, did not mention any mental health symptoms in her February 2008 report; (2) Melissa Buttars, a therapist who treated Diedrich, did not mention particular mental health symptoms in her May 2005 report; (3) in the ALJ's view of the record, there were no observations of Diedrich's different personalities and there was no report mentioning multiple personalities before Diedrich's date last insured; and (4) the ALJ viewed Diedrich's daily life as involving a wide range of activities.

Based on our review of the record in this case, we conclude that none of these reasons is "clear and convincing." *Id*.

Regarding Dr. Robinson's report, the ALJ said that Dr. Robinson "did not make any observations about the claimant being anxious, flighty, depressed, or manic, which would suggest that [] the claimant's mental health symptoms were not as severe as she testified to at the hearing." But even if Diedrich were suffering from such symptoms, we would not necessarily expect Dr. Robinson to note them in her report. Dr. Robinson was an orthopedist, not a mental health professional. She might have thought it beyond her capacity to inquire or comment about mental health symptoms. In line with her specialty, Dr. Robinson reported the pain that Diedrich said she was feeling in her back, shoulder, neck, hand, and wrist. Still, under the heading "Chief Complaints," Dr. Robinson noted "Multiple psychiatric history; bipolar disorder, ADHD, borderline personality disorder, panic disorder, agoraphobia." It is unsurprising that Dr. Robinson did not also mention Diedrich's specific mental health symptoms. That she did not do so, in our view, says little about the extent to which Diedrich may in fact have been suffering from such symptoms.

Moreover, the same month that Diedrich saw Dr. Robinson, she also saw a psychologist, Dr. Nick Dietlein. Dr. Dietlein concluded that Diedrich presented "symptoms consistent with a Major Depressive Disorder and PTSD. It is very possible that she has Attention Deficit Disorder." Dr. Dietlein's conclusions reinforce that the absence of mental health symptoms from Dr. Robinson's report does not tend to prove, let alone prove persuasively, that Diedrich lacked such symptoms. Dr. Robinson's report does not provide a clear and convincing reason for discounting Diedrich's testimony.

Regarding therapist Buttars's May 2005 assessment, the ALJ noted that Buttars found "no indication of hallucinations, delusions, obsessions, phobias, or perceptual disturbances"; that Diedrich described her mood to Buttars as "good"; and that Buttars found Diedrich's social judgment, intellectual functioning, and memory all normal. However, the fact that Diedrich was not exhibiting certain symptoms at the time of her appointment on a particular day does not indicate that Diedrich was not experiencing those symptoms generally or at other pertinent times. As the Ninth Circuit has explained:

> [Regarding] mental health issues, it is error to reject a claimant's testimony merely because symptoms wax and wane in the course of treatment. Cycles of improvement and debilitating symptoms are a common occurrence, and in such circumstances it is error for an ALJ to pick out a few isolated instances of improvement over a period of months or years and to treat them as a basis for concluding a claimant is capable of working . . . . While ALJs obviously must rely on examples to show why they do not believe that a claimant is credible, the data points they choose must *in fact* constitute examples of a broader development to satisfy the applicable "clear and convincing" standard.

*Garrison*, 759 F.3d at 1017–18. Here, the absence of certain symptoms from Buttars's report is insufficient to show a "broader development" that Diedrich did not experience those symptoms. *Id.* at 1018. Indeed, Buttars's report noted that Diedrich's mental health disorders were in partial

remission. It was improper for the ALJ to discount Diedrich's testimony by "cherry pick[ing]" the absence of certain symptoms from this report. *Attmore v. Colvin*, 827 F.3d 872, 877 (9th Cir. 2016) (quoting *Scott v. Astrue*, 647 F.3d 734, 740 (7th Cir. 2011)). Buttars's report does not provide a clear and convincing reason to find Diedrich's claims regarding the extent of her symptoms unreliable.

Next, we address the ALJ's comments that nobody observed Diedrich's different personalities and that no report mentioned multiple personalities before Diedrich's last date insured. We disagree with the ALJ that the record supports this characterization. At the hearing, Niebaum testified in detail about his observations of Diedrich's split personality symptoms. He also mentioned those symptoms in his third-party function report. And, though Niebaum's observations began three months after Diedrich's date last insured, they still to a degree support the notion that Diedrich's split personality symptoms during the insured period were as she described them. *See Tobeler*, 749 F.3d at 833. In addition, a counseling progress report from May 2007 mentioned that Diedrich had a history of "blackouts" that were triggered by arguments or events that "evoked intense feelings." It also noted that a previous therapist had diagnosed Diedrich with split personality disorder. The ALJ's characterization of the record does not survive scrutiny. We conclude that the ALJ's assertions related to Diedrich's split personality disorder are not clear and convincing reasons to find Diedrich only partially credible.

Finally, we address the ALJ's argument that Diedrich's "activities of daily living are wide." The ALJ took note of certain daily activities that Diedrich could perform, such as bathing, cooking, taking care of her cat, chores around the house, shopping, paying bills, and using a checkbook. But

the ALJ ignored other evidence showing the difficulties Diedrich faced in everyday life. *See Gallant v. Heckler*, 753 F.2d 1450, 1456 (9th Cir. 1984) (ALJ may not justify a credibility finding "by ignoring competent evidence in the record that suggests an opposite result"). This evidence included going three to five days without sleeping; weeks-long bouts of depression; overspending and promiscuousness during manic periods; hallucinations; difficulty paying attention; inability to follow through on activities; difficulty remembering things; severe panic attacks; anxiety about, and aversion to, social situations; blackouts and alternate personalities; needing reminders to take medicine; forgetting appointments; getting sidetracked when outside the house; frustration and confusion when reading; trouble following and remembering instructions; trouble with changes to routine; trouble handling stress; and "extreme difficulty" staying focused on a task. That Diedrich could participate in some daily activities does not contradict the evidence of otherwise severe problems that she encountered in her daily life during the relevant period.

The sorts of daily activities Diedrich could perform are also not readily "transferrable to a work environment." *Ghanim v. Colvin*, 763 F.3d 1154, 1165 (9th Cir. 2014) (internal quotation marks omitted); *see also Smolen*, 80 F.3d at 1284 n.7 ("The Social Security Act does not require that claimants be utterly incapacitated to be eligible for benefits, and many home activities may not be easily transferable to a work environment . . . ."). House chores, cooking simple meals, self-grooming, paying bills, writing checks, and caring for a cat in one's own home, as well as occasional shopping outside the home, are not similar to typical work responsibilities. *See, e.g.*, *Gallant*, 753 F.2d at 1453 (ordering award of benefits for leg and back pain despite claimant's daily activities of cooking meals and washing

dishes). We note that even though Diedrich was performing these tasks, she was likely not doing them with the consistency and persistence that a work environment requires. *See Fair v. Bowen*, 885 F.2d 597, 603 (9th Cir. 1989) ("[M]any home activities are not easily transferable to what may be the more grueling environment of the workplace, where it might be impossible to periodically rest or take medication."). Diedrich's symptoms also included anxiety related to social interactions, making a task easy to perform inside the home potentially very difficult to perform outside the home. Diedrich's ability to perform certain daily activities is not a clear and convincing reason to find her less than fully credible.

We conclude that none of the ALJ's given reasons for finding Diedrich only partially credible is clear and convincing. We hold that the ALJ erred in its credibility finding related to Diedrich.

**IV**

In summary, we hold that the ALJ erred (1) by not calling a medical advisor to help determine the precise onset date of Diedrich's disability; (2) by giving "little weight" to Niebaum's observations; and (3) by finding Diedrich only "partially credible." We also conclude that none of these errors is harmless. *See Molina*, 674 F.3d at 1115. On the grounds listed, we reverse in part the district court's decision. In a separately filed memorandum disposition, we otherwise affirm in part the district court's decision. We remand for further proceedings with instructions that the ALJ's decision be vacated, and that the district court shall remand to the ALJ with instruction that it should call a medical advisor and otherwise proceed in a manner consistent with our opinion.

The Commissioner shall bear all costs on appeal.

**AFFIRMED in part, REVERSED in part, and REMANDED.**

---

RAWLINSON, Circuit Judge, dissenting:

I respectfully dissent from my colleagues' conclusions that the Administrative Law Judge (ALJ) "erred in its assessment (1) by not calling a medical advisor at the hearing; (2) by giving too little weight to the observations of [Plaintiff-Appellant Brenda M.] Diedrich's fiancé; and (3) by finding that Diedrich was only partially credible." *Majority Opinion*, p. 4.

It is unquestioned and unquestionable that the claimant suffered from significant physical and mental impairments. The issue raised in the proceedings was whether those impairments rendered the claimant disabled under the Social Security Act. The ALJ ruled that they did not. Our task is to examine whether the ALJ's determination is supported by substantial evidence, not whether we disagree with the ALJ's determination. *See Attmore v. Colvin*, 827 F.3d 872, 875 (9th Cir. 2016).

1. *Failure To Call A Medical Advisor*

The majority concludes that the ALJ committed legal error by failing to call a medical advisor to assist in determining the disability onset date. *See Majority Opinion*, p. 11. The majority acknowledges that we have consistently ruled that a medical advisor is required only if there is ambiguity in the record and the onset date must be inferred. *See id.*, p. 9; *see also Armstrong v. Comm'r*, 160 F.3d 587,

589 (9th Cir. 1998). However, the majority opinion points to no real ambiguity in the record regarding the onset date of the claimant's disability. Indeed, the ALJ, without objection, accepted the alleged onset date of October 1, 2002, when evaluating the evidence offered to support a finding of disability. The majority seeks to manufacture an ambiguity by selectively referring to portions of the record. *See Majority Opinion*, p. 10. But the fact remains that the parties did not dispute the onset date alleged by Diedrich and accepted by the ALJ. There is absolutely no ambiguity in this record regarding the asserted onset date.

More importantly, we have ruled that no medical advisor is required if the ALJ determines that the claimant was never disabled. *See Sam v. Astrue*, 550 F.3d 808, 809 (9th Cir. 2008). This ruling makes perfect sense because if there was never a disability, the onset date no longer has relevance. In concluding that this precedent does not apply, the majority inexplicably ignores at least four explicit findings of non-disability made by the ALJ.

On page 1 of her decision, the ALJ stated:

> After careful consideration of all the evidence, the undersigned concludes the claimant was not under a disability within the meaning of the Social Security Act. . .

On page 12 of the decision, the ALJ determined:

> A finding of "not disabled" is therefore appropriate under the framework of the above cited rule.

. . .

**The claimant was not under a disability, as
defined in the Social Security Act, at any
time from October 1, 2002, the alleged
onset date, through June 30, 2008, the date
last insured . . .**

In her conclusion on page 13 of the decision, the ALJ
reiterated:

Based on the application for a period of
disability and disability insurance benefits
. . ., the claimant was not disabled under
sections 216(i) and 223(d) of the Social
Security Act . . .

In view of the ALJ's repeated findings of no disability,
it cannot credibly be gainsaid that the ALJ found the
claimant was not disabled. That finding placed this case
within our holding in *Sam* that no medical advisor was
required. No legal error occurred. *See Sam*, 550 F.3d at 810
("Because the ALJ found that Sam was not disabled *at any
time* through the date of the decision, the question of *when*
he became disabled did not arise and the procedures
prescribed in SSR 83-20 did not apply.") (citation omitted)
(emphases in *Sam*). In *Sam*, we clarified that "SSR 83-20
addresses the situation in which an administrative law judge
makes a finding that an individual is disabled as of an
application date and the question arises as to whether the
disparity arose at an earlier time." *Id.* (citation omitted).

We distinguished our earlier decisions in *Armstrong* and
*Morgan v. Sullivan*, 945 F.2d 1079 (9th Cir. 1991), as
applying when "there was either an explicit ALJ finding or
substantial evidence that the claimant was disabled *at some
point after the date last insured, thus raising a question of*

*onset date*." *Sam*, 550 F.3d at 811 (emphasis added). In contrast, the ALJ in *Sam*, like the ALJ in the case before us, "found that [the claimant was not disabled at any time." *Id*. In light of that finding, "the ALJ was not required by SSR 83-20 to introduce a medical expert into the process." *Id*.

### 2. *Giving Too Little Weight To The Testimony Of Claimant's Fiancé*

This issue may be resolved by reviewing the claimant's testimony because we have ruled that where the ALJ provides germane reasons for giving less weight to subjective testimony from one witness, similar testimony by a different witness may also be given less weight. *See Molina v. Astrue*, 674 F.3d 1104, 1114 (9th Cir. 2012) ("[B]ecause the ALJ provided clear and convincing reasons for rejecting the claimant's own subjective complaints, and because the lay witness's testimony was similar to such complaints, it follows that the ALJ also gave germane reasons for rejecting the lay witness's testimony.") (quoting *Valentine v. Comm'r*, 574 F.3d 685, 694 (9th Cir. 2009) (internal quotation marks omitted)).

As discussed below, the ALJ gave "clear and convincing" reasons for only partially crediting the claimant's testimony. *Garrison v. Colvin*, 759 F.3d 995, 1014–15 (9th Cir. 2014) (setting standard). As a result, the testimony of claimant's fiancé fares no better. *See Molina*, 674 F.3d at 1114.

### 3. *Partially Crediting Claimant's Testimony*

The ALJ provided the following reasons for only partially crediting the claimant's testimony:

(1) Although the claimant testified that she suffered from "severe mania, depression, anxiety, and agoraphobia," the "orthopedic consultative examiner . . . did not make any observations about the claimant being anxious, flighty, depressed, or manic." In addition, mental health treatment notes support a conclusion that the claimant was capable of functioning." A mental health examination reflected "no indication[s] of hallucinations, delusions, obsessions, phobias, or perceptual disturbances." Indeed, the claimant herself "described her mood as 'good' and her social judgment, intellectual functioning, and memory were all normal." Despite the claimant's testimony regarding multiple personalities and disassociative disorder," there were no reported observations of multiple personalities in the record.

(2) The claimant engaged in a wide range of daily living activities that were inconsistent with her asserted disability. The claimant lived alone with her cat, dressed herself, bathed herself, enjoyed cooking, fed her cat, cleaned the cat's litter box, cleaned her home, washed dishes, vacuumed and cleaned her bathrooms. She sometimes walked and sometimes traveled by car to various destinations. She shopped for groceries and clothes, and was able to pay bills, count change, and use a checkbook. She also managed a savings account.

We have consistently held that similar findings constituted substantial evidence to support a partial credibility determination made by an ALJ. *See*, *e.g.*, *Lewis v. Apfel*, 236 F.3d 503, 511 (9th Cir. 2001) ("One reason for which an ALJ may discount lay testimony is that it conflicts with medical evidence.") (citation omitted); *see also id*. at 512 ("The absence of any mention of fatigue, along with the 'no side effects' observations in [claimant's] medical

reports, supported the ALJ's rejection of . . . testimony that [claimant] had suffered chronic fatigue . . .").

The majority takes issue with the partial credibility finding of the ALJ, specifically challenging the bona fides of the reasons articulated by the ALJ to support her finding.

In addressing the ALJ's reliance on the lack of any reference to the claimant being "anxious, flighty, depressed or manic," in Dr. Robinson's report, the majority observes that Dr. Robinson was an orthopedist rather than a mental health professional. *Majority Opinion*, p. 15. However, an orthopedic physician is an acceptable medical source upon whose observations the ALJ properly relied. *See* 20 C.F.R. § 416.902(a) (defining "acceptable medical source"). The listing of complaints referenced by the majority, *see Majority Opinion*, p. 15, merely represented claimant's summary of her condition rather than observations of the physician. *See Tommasetti v. Astrue*, 533 F.3d 1035, 1041 (9th Cir. 2008) (permitting an ALJ to "reject a treating physician's opinion if it is based to a large extent on a claimant's self-reports . . .") (citation and internal quotation marks omitted).

The majority also refers to the claimant's visit to a psychologist, Dr. Dietlein. *See Majority Opinion*, p. 15. Nevertheless, the bottom line of Dr. Dietlein's opinion does not support a claim of mental disability. In Dr. Dietlein's Summary of Findings, he concluded: "Today's evaluation revealed that Ms. Diedrich is able to understand and remember instructions, is able to sustain her concentration and attention and is able to persist. She was able to engage in social interactions successfully. I believe she would be able to adequately manage any funds that might be given to her."

Addressing the lack of mental health symptoms observed by therapist Buttar, the majority offers the following equivocation:

> [T]he fact that Diedrich was not exhibiting certain symptoms at the time of her appointment on a particular day does not indicate that Diedrich was not experiencing those symptoms generally or at other pertinent times. . . .

*Majority Opinion*, p. 16.

The majority also isolates therapist Buttar's observations to argue the absence of a "broader development" of mental health issues. *Majority Opinion*, p. 16 (quoting *Garrison v. Colvin*, 759 F.3d 995, 1017–18 (9th Cir. 2014)). The flaw in the majority's argument is that Buttar's observations were buttressed by the similar observations of Drs. Robinson and Dietlin, reflecting a "broader development" of the absence of a disabling mental disability. *Garrison*, 759 F.3d at 1017.

More fundamentally, the majority's reliance on *Garrison* is singularly misplaced because the facts in *Garrison* are almost the polar opposite of the facts in this record. In *Garrison*, the "diagnoses of [post-traumatic stress disorder] and bipolar disorder remained constant across all treatment records." *Id*. at 1017. In this case, in contrast, the *absence* of any observed disabling mental impairment "remained constant across all treatment records." *Id*. (emphasis added).

At best, the majority's view is an alternative interpretation of the evidence presented at the hearing. However, we have repeatedly held that if there are two permissible views of the evidence, the view taken by the ALJ must stand. *See Burch v. Barnhart*, 400 F.3d 676, 679

("Where evidence is susceptible to more than one rational interpretation, *it is the ALJ's* conclusion that must be upheld. . . ." (citation omitted) (emphasis added); *see also Garrison*, 759 F.3d at 1010 ("Where the evidence can reasonably support either affirming or reversing a decision, we may not substitute our judgment for that of the ALJ. . . .") (citation and alteration omitted); *Holohan v. Massanari*, 246 F.3d 1195, 1201 (9th Cir. 2001) (same).

The majority also takes issue with the ALJ's discounting of the "split personality" disorder evidence. *See Majority Opinion*, p. 17. As an initial matter, the reference to a previous diagnosis of split personality was based entirely on the claimant's own reporting, and may be discounted on that basis. *See Ryan v. Comm'r of Soc. Sec.*, 528 F.3d 1194, 1206–07 (9th Cir. 2008) (holding that "an ALJ may discount a medical opinion that relies on subjective statements rather than clinical findings"). In addition, reliance on the observations of claimant's fiancé to support the diagnosis of "split personality" is problematic for two reasons: 1) the observations were made after the date last insured and 2) the observations were not consistent with the medical evidence of record. *See Dale v. Colvin*, 823 F.3d 941, 944 (9th Cir. 2016) (describing after-the-fact observations of the claimant's impairments as "marginally relevant," especially where the evidence differed from the opinion of the doctors); *see also Batson v. Comm'r*, 359 F.3d 1190, 1196 (9th Cir. 2004) (approving ALJ discrediting of claimant's testimony that was inconsistent with the medical evidence); *Bayliss v. Barnhart*, 427 F.3d 1211, 1218 (9th Cir. 2005) (approving ALJ discrediting of family member testimony that was inconsistent with the medical evidence); *Vincent on behalf of Vincent v. Heckler*, 739 F.2d 1393, 1395 (9th Cir. 1984) (same). In sum, the ALJ's discounting of the fiancé's testimony was supported by substantial evidence.

We have regularly defined substantial evidence as "more than a scintilla [but] less than a preponderance." *Holohan*, 246 F.3d at 1201, *quoting Tackett v. Apfel*, 180 F.3d 1094, 1097 (9th Cir. 1999). We have emphasized that the substantial evidence standard is "very deferential . . . even more so than the 'clearly erroneous' standard." *Brault v. Social Sec. Admin*., 683 F.3d 443, 448 (9th Cir. 2012) (citation omitted). We have clarified that "[t]he substantial evidence standard means once an ALJ finds facts, we can reject those facts only if a reasonable factfinder *would have to conclude otherwise*." *Id*. (citations and internal quotation marks omitted) (emphasis in the original).

Unfortunately, the majority failed to adhere to this standard throughout the majority opinion, but most especially when reviewing the ALJ's determination that the claimant's daily activities were inconsistent with the asserted level of impairment.

The ALJ noted that the claimant lived alone with her cat, cared for her cat, bathed and dressed herself, enjoyed cooking, and cleaned her home. She shopped for groceries and clothing, paid bills, counted change, used a checkbook, and managed a savings account.

We have recognized and affirmed findings of an ALJ that similar "daily activities [of a claimant] are inconsistent with [her] allegations of disability." *Carmickle v. Comm'r*, 533 F.3d 1155, 1163 (9th Cir. 2008).

More precisely, we have upheld similar credibility findings in cases involving facts virtually identical to those in this case. *See Batson*, 359 F.3d at 1196 (upholding a partial credibility determination where the claimant "tend[ed] his animals, walk[ed] outdoors, [went] out for coffee, and visit[ed] with neighbors"); *see also Morgan v.*

*Comm'r*, 169 F.3d 595, 600 (9th Cir. 1999) (affirming that the ALJ "provided specific and substantial reasons that undermine [claimant's] credibility," including the claimant's "ability to fix meals, do laundry, work in the yard, and occasionally care for his friend's child").

In *Burch*, 400 F.3d at 680–81, the ALJ noted that the claimant was "able to care for her own personal needs, cook, clean and shop. She interact[ed] with her nephew and her boyfriend. She [was] able to manage her own finances and those of her nephew." In upholding the ALJ's partial rejection of the claimant's testimony, we emphasized:

> Although the evidence of [the claimant's] daily activities may also admit of an interpretation more favorable to [the claimant], the ALJ's interpretation was rational, and we must uphold the ALJ's decision where the evidence is susceptible to more than one rational interpretation.

*Id*. (alteration omitted).

After applying the deferential substantial evidence standard of review, I agree with the magistrate judge and the district court that the decision of the ALJ was free of legal error and supported by substantial evidence. In my view, the majority reaches a different result by reweighing the evidence, something we are not permitted to do. *See Brault*, 683 F.3d at 447 ("[I]t is not our function to determine *de novo* whether a [claimant] is disabled. . . .) (citation and alteration omitted).

I respectfully dissent.